1

2

3

4

5                                        UNITED STATES DISTRICT COURT

6                                       NORTHERN DISTRICT OF CALIFORNIA

7

8    JAMES WASHINGTON,                              No. C 06-4490 SI (pr)

9                   Petitioner,                     **ORDER DENYING PETITION FOR
                                                    WRIT OF HABEAS CORPUS**
10         v.

11   D. OLLISON, Warden,

12                  Respondent.
                                          /
13

14

15                                              **INTRODUCTION**

16         This matter is now before the court for consideration of the merits of James Washington's

17   pro se petition for writ of habeas corpus concerning his conviction in the Alameda County

18   Superior Court.  For the reasons discussed below, the petition will be denied.

19

20                                              **BACKGROUND**

21   A.    The Crime

22         Washington was convicted of being a felon in possession of a firearm.  It was a

23   vigorously litigated case, as the conviction plus his prior convictions made Washington eligible

24   for sentencing under California's Three Strikes law.  The gun was found under the mattress of

25   a bed in which he slept with his then-girlfriend, Lisa Lewis, at the house at which he stayed at

26   least several nights a week.  Law enforcement officers were investigating Washington in

27   connection with other crimes, and the search that uncovered the gun was done as part of those

28   investigations by officers from several different law enforcement agencies.  Washington made

numerous incriminating statements in jailhouse conversations with Lisa Lewis after his arrest.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

The trial focused on Washington's possession, knowledge and intent.  The details of how the search came to occur, how the search was executed, what was found in the search, how Washington and Lewis were questioned, and what Washington and Lewis said thereafter in recorded jailhouse conversations were described by the California Court of Appeal (and provide important background for this court's evaluation of the constitutional claims).

Warner Smith became appellant's parole officer in 1996.  While appellant was on parole, he was told that both he and his residence would be subject to search without a warrant; he was subject to drug testing; and he could not possess weapons including firearms. Appellant indicated he would be living with his father on Holly Street in Oakland, and Smith met with appellant at that location shortly after he was paroled, testing him for illegal drugs.  Appellant always passed the agent's drug testing.  Later, appellant advised Smith he would be spending a few nights a week with his girlfriend Lisa Lewis (Lewis) who lived on Cary Court in Oakland.  Appellant never told Smith that he had moved into the Cary Court residence, although Smith suspected this was the case.

In October of 1998, Smith was contacted by members of the San Francisco Police Department.  The officers were interested in conducting a search of appellant's residence, as he was suspected of committing a crime in San Francisco.  Smith contacted appellant and, without telling appellant that a search was being contemplated, asked if he was living with Lewis at Cary Court.  In the tape recorded phone call, appellant admitted he was now living with Lewis at the Cary Court address.  Smith then authorized a parole search of the Cary Court residence.

The officers feared appellant might be armed.  For purposes of officer safety during the search, appellant was called into Smith's office for a routine appointment, and the search at Cary Court was conducted while he was at that location.

Inspector Anthony Camilleri (Camilleri), who was employed by the San Francisco Police Department, carried out the search of appellant's residence at Cary Court. Camilleri did not rely solely on the authorization from Smith to conduct a parole search; he also obtained a search warrant for the Cary Court residence, which he served in the company of other officers on October 28, 1998, at about 11:20 a.m.  When the officers knocked on the front door, Lewis answered, and she let them in.  The only other person present was a small child, appellant's daughter.

The officers recovered numerous items of evidence which indicated appellant lived at the premises, including a phone bill in his name addressed to the Cary Court address, and appellant's calendar year 1989 address book, both of which were in the master bedroom.  The officers also found a traffic citation dating back to the previous April, which had been addressed to appellant at his father's Holly Street residence, and various other items belonging to him.  Further, a box of Remington .38-caliber ammunition was located in a nylon pouch on a shelf in a closet of the master bedroom. The pouch also contained an envelope bearing the name of appellant's friend, George Fitzpatrick.  Inside the envelope was a copy of a driver's license and social security card of Charles Morris.  The bedroom also contained adult male clothing and a stolen laptop computer.  A firearm, a two-shot .38-caliber Derringer handgun, was retrieved from under the mattress of the bed in the master bedroom.  The weapon was not loaded.

United States District Court
For the Northern District of California

1

2

3

4

Camilleri later interviewed Lewis, after she agreed to speak with him at the Oakland Police Department. . . .  Lewis told Camilleri that appellant had been living at Cary Court for several months, and was the only adult male living with her.  At trial a redacted tape of this interview was played, in which Lewis said she did not know the gun was under her bed, and it could only have gotten there because appellant put it there.  Lewis also stated that appellant's friend George Fitzpatrick had damaged one of appellant's cars in a chase.

5

6

7

Camilleri also interviewed appellant, after advising him of his <u>Miranda</u> rights.  Appellant identified his calendar address book, and discussed a number of friends who had visited him at his Cary Court residence, including George Fitzpatrick, who had been driving a Hyundai car loaned to him by appellant when it was wrecked following a high speed chase. . . .

8

9

10

11

12

Inspector Raymond Conner of the Alameda County District Attorney's office also assisted in the search at Cary Court, as well as with the interviews of appellant and Lewis.  Appellant told Conner he lived at Cary Court where he entertained friends such as George Fitzpatrick.  He also worked on cars at that location, including the Kia automobile appellant had loaned to George Fitzpatrick, which had been wrecked in a high speed chase following an armed robbery.  A newspaper article covering that incident was located at the Cary Court residence, in the master bedroom, rolled up inside some clothing in the closet.  Appellant also told Conner the handgun found under the mattress belonged to Lewis, admitting that he had seen the gun previously. . . .

13

14

15

16

Cal. Ct. App. Opinion, ¶. 2-4.  Various telephone calls and jailhouse visits between Lewis and Washington were taped while he was in jail.  During those conversations, they made comments indicating they were aware of being taped and used guarded language and slang.  Nonetheless, they made several damaging statements:

17

18

19

20

21

22

23

24

Appellant instructed Lewis what she should say in order to provide him with a defense, suggesting Lewis should testify he had not been a resident of her home and had been merely staying or visiting there on an occasional basis.  He also encouraged Lewis to testify the police had mistreated her, and that they had intimidated her into saying the gun under the mattress belonged to appellant.  Appellant suggested Lewis should say she had been confused as between the .38-caliber Derringer found under the mattress and another gun, a .22-caliber handgun, which appellant had previously possessed.  These taped conversations were played for the jury. [¶] Regarding the .38 caliber Derringer, the taped conversations revealed that appellant directed Lewis to either say the gun belonged to her, or belonged to appellant's friend Ron Young, or belonged to Ron's wife Pam Young, or belonged to Ron Young's mother, Mildred Thompson.  Lewis was to explain her prior inconsistent statements to the police as being the result of police pressure or fear that she could lose her federally subsidized section eight housing by admitting ownership of the gun.

25

Cal. Ct. App. Opinion, ¶. 4-5.

26

27

28

At trial, Lewis gave testimony that in many respects contradicted her initial statements to police and in many respects was consistent with the story suggested by Washington during the taped jailhouse conversations.  She testified that police did not treat her well and that she felt

3

intimidated by the police when she gave her initial statements; that Pam Young gave the Derringer to Lewis as collateral for a loan; that she (Lewis) put the gun under the mattress; that Washington had only seen the gun but never handled it; and that she did not tell the police the gun was hers because she was concerned that she might lose her section eight housing if she admitted possessing a gun. Lewis said she did not know about the ammunition that was found in the closet of the room.

The defense presented testimony from Washington's father and nephew that Washington resided sometimes with his father; testimony from Mildred Thompson that she had given the Derringer to her son (i.e., Ron Young, husband of Pam Young), and later learned the gun had been pawned to a woman; and testimony from Donald Young that he went with his sister-in-law, Pam Young, and saw her take a gun into the Cary Court residence one day in October 1998.

B.   <u>Procedural History</u>

Following a jury trial in Alameda County Superior Court, Washington was convicted of being a felon in possession of a firearm and was found to have suffered six prior felony convictions. Three of the prior convictions were charged as strikes and three were charged as prison priors. On July 20, 2001, Washington was sentenced to 28 years to life in prison under California's Three Strikes law.

He appealed. The California Court of Appeal affirmed the conviction in a reasoned opinion. The California Supreme Court denied his petition for review and petition for writ of habeas corpus without discussion. Washington filed additional state habeas petitions. None succeeded.

Washington then filed this action. The court issued an order to show cause on seven issues on August 15, 2006. After a lengthy delay while the court waited for petitioner to file an amended petition that he eventually decided not to file, the court ordered respondent to file his answer. Respondent filed an answer and petitioner filed a traverse. The case is now ready for review on the merits.

United States District Court
For the Northern District of California

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over the petition for writ of habeas corpus under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged conviction occurred in Alameda County, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  28 U.S.C. § 2254(b), (c).  State judicial remedies have been exhausted for the claims presented in the petition, except as to the Eighth Amendment claim. The court reaches the Eighth Amendment claim because it will be denied as not colorable.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially

indistinguishable facts." <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." <u>Id.</u> at 409.

## DISCUSSION

A.      <u>Ineffective Assistance Of Counsel Claims</u>

The Sixth Amendment's right to counsel guarantees not only assistance, but effective assistance, of counsel. <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. <u>Id.</u> In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Washington must establish two things. First, he must demonstrate that counsel's performance was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms. <u>Id.</u> at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. <u>Id.</u> The relevant inquiry under <u>Strickland</u> is not what defense counsel could have done, but rather whether his choices were reasonable. <u>See Babbitt v. Calderon</u>, 151 F.3d 1170, 1173 (9th Cir. 1998). A lawyer need not file a motion or make an objection that he knows to be meritless on the facts and the law. <u>See Wilson v. Henry</u>, 185 F.3d 986, 990 (9th Cir. 1999); <u>Rupe v. Wood</u>,

United States District Court
For the Northern District of California

93 F.3d 1434, 1445 (9th Cir. 1996) (failure to take futile action is not deficient performance). When a claim may be disposed of using the prejudice prong, the reviewing court may bypass the performance prong and resolve it on the prejudice prong. See Strickland, 466 U.S. at 697; Williams v. Calderon, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995).

Washington urges that the state appellate court erred in using a sufficiency of the evidence test in place of the Strickland prejudice test. He is correct that the two tests are not equivalents, but incorrect that the state court used the wrong test. Although the Strickland prejudice test is not a sufficiency of the evidence test, the state of the evidence often plays a large role in the prejudice analysis. An error that may have a greater impact in a case in which the evidence against a defendant is weak may have a lesser impact in a case in which the evidence against a defendant is strong. See, e.g., Luna v. Cambra, 306 F.3d 954, 966-67 (9th Cir. 2002) (counsel's failure to investigate and present testimony of alibi witnesses and exonerating witness was prejudicial in light of prosecution's relatively weak case; prosecution's case rested solely on victim's identification of defendant and the probative value of victim's identification was limited because he had been drinking, he was not wearing prescribed eye glasses, he was attacked in the middle of the night, and the lighting was poor); Greene v. Henry, 302 F.3d 1067, 1072-74 (9th Cir. 2002) (finding no prejudice based on failure to investigate and call new witnesses where case "was already as good as it was going to get" from defense lawyer's point of view). As did the state appellate court, this court considers the evidence of guilt and the defense – not to do a sufficiency of the evidence test, but to evaluate whether there was a reasonable probability of a different outcome based on the admission of the unobjected-to evidence. Another factor that is considered in evaluating the prejudice resulting from an alleged error is the length of jury deliberations. See e.g., Jennings v. Woodford, 290 F.3d 1006, 1019 (9th Cir. 2002); Mayfield v. Woodford, 270 F.3d 915, 932 (9th Cir. 2001)  Here, the relatively short deliberation – less than seven hours after a ten-day trial, see CT 242, 245 – doesn't suggest a close case.

     1.     Failure To Object To Certain Evidence

a.      Other Crimes

Washington urges that defense counsel was ineffective in that he failed to object to evidence that may have suggested that Washington was involved in other crimes and that law enforcement was interested in him for more than just the possession of a gun.  There were several references to the fact that Washington was under suspicion for other crimes, specifically a homicide in San Francisco and a robbery and rape in Piedmont.  There also were several references to the fact that the law enforcement officers were from several different locales and that some of the officers were from the homicide division of the police department.

The problem of the other crimes evidence was considered at a pretrial proceeding during which the prosecutor sought guidance about how to identify the employment of the officers at the various law enforcement agencies.  The trial court noted that the fact that numerous officers from other jurisdictions were involved could not be hidden from the jury and did not want to have the officers misrepresent the nature of their employment to conceal the agencies that were involved.

At trial, no evidence was presented regarding the particulars of these other crimes or the particulars of Washington's suspected involvement in them.  Some evidence was introduced that did, however, show that the search and interviews were carried out by officers from San Francisco, Piedmont and Oakland police departments; that some of the officers involved were from the homicide division; and that they were investigating a homicide in San Francisco and a rape and robbery in Piedmont.  There also was evidence that the search warrant purposely was served at a time when the officers knew Washington would not be home due to a concern that he might be armed.

The California Court of Appeal rejected Washington's argument that defense counsel's failure to object to this evidence amounted to ineffective assistance of counsel.

> [W]e are not persuaded by appellant's present arguments that the testimony concerning officer safety, or the participation of officers from different police agencies in the search at Cary Court, was improper or prejudicial.  As mentioned, evidence was admitted that the officers feared appellant might be armed and he was therefore asked to report to his parole officer when the search warrant was to be served.  This evidence had some probative value, for the prosecution was entitled to show the officers had legitimate

reasons related to officer safety which caused them to lure appellant away from the Cary Court address at the time of the search, and this was not part of some untoward effort to intimidate Lewis into implicating appellant as the defense implied.   We therefore conclude that trial counsel was not ineffective in failing to timely object to such evidence. (Strickland v. Washington, supra, 466 U.S. at ¶. 686-692.) . . .

Similarly, testimony disclosing that officers from various jurisdictions participated in the search and subsequent interviews, because appellant had been suspected of crimes in those other jurisdictions, was simply a fact that could not reasonably be concealed from jurors.  The court had precluded any evidence of appellant's possible involvement in the San Francisco homicide or the Piedmont rape-robbery, . . . but this ruling did not bar officers Camilleri and Casillas from identifying the nature of their employment at the time, such as identifying themselves as "homicide" inspectors.

Under the circumstances, we do not find the disclosure of the officers' employment or mere references to other uncharged criminal offenses particularly inflammatory.  The prosecution never suggested the uncharged crimes were committed by appellant, or should be used to infer appellant's guilt as to the firearm charge, and there was in fact no testimony as to the details of these offenses.  About the most that can be said is that jurors may have surmised appellant was a suspect in crimes committed in other jurisdictions, but that he had not been charged with those crimes, and no evidence linking him to such crimes was discovered in the search and interviews.

Cal. Ct. App. Opinion, ¶. 11-12 (footnotes omitted).

Washington has not shown that the California Court of Appeal's rejection of his claim was unreasonable or contrary to clearly established Supreme Court precedent.  The court cited the Strickland case and reasonably applied it to conclude that the claim failed for lack of a showing of both deficient performance and prejudice.  Although the jury heard evidence from which it could figure out that various law enforcement agencies were interested in Washington and the interest pertained to a homicide in San Francisco and a robbery and rape in Piedmont, the evidence was quite limited and no details of those crimes were explored.  The circumstances of the search were important to both the prosecution and the defense, and it would have been nearly impossible to keep the jury ignorant of the fact that Washington had come to the attention of police authorities for more than just the possession of the gun.  Washington personally (and apparently against the advice of counsel) refused to stipulate that the search was valid and that law enforcement was at Cary Court pursuant to a valid warrant,  see RT 1480, and that refusal made it more likely that the jury would hear some references about the extent of the involvement of different law enforcement agencies.  The information about the large police presence at the search also was relevant to his defense theory that Lisa Lewis' initial statements were made

because she was scared and confused by the police presence and being taken to the police station and interviewed by several law enforcement officers.  For example, defense counsel elicited testimony that the search was done by 15-20 people, many or all of whom were wearing masks and raid jackets, and some of whom went under the house and others of whom went on the roof of the house during the search.  The tapes of the jailhouse conversations (on which there were references to the other crimes) were admitted because it was on those tapes that Washington coached Lisa Lewis to change her story and to offer drugs to other witnesses to testify.[1]   Also, by virtue of the nature of the offense of being a felon in possession of a firearm, the jury had to know that Washington had at least one felony in his background.  This was not a case in which the prosecutor used strong evidence of uncharged crimes to cast a bad light on the defendant to bolster a weak case.  The determination that Washington's claim fails on both the deficient performance and prejudice prongs was a reasonable application of <u>Strickland</u>.

### b.   Guns and Ammunition

Washington also contends that trial counsel was ineffective in not objecting to evidence that Washington had been present when another gun was discharged, that ammunition was recovered during the search, and that the Derringer was a type of weapon commonly used by criminals and drug dealers.

The state appellate court rejected the claim that counsel should have objected to the ammunition evidence because an objection would have been futile and there was no prejudice. Cal. Ct. App. Opinion, p. 14.  This court agrees: there was no deficient performance or prejudice from the non-objection to the evidence that ammunition was found in the house.  Washington's argument that he was not charged with possession of ammunition misses the point: the existence

---

[1]The materials before this court do not include the tapes or transcripts of the jailhouse conversations in which Washington made some of the damaging statements.  Where the tapes were played for the jury, the reporter's transcript notes the playing of the tapes, but does not report the substance of them.  This omission of material does not preclude resolution of Washington's petition, however, because his state court filings (which are in the record) described the statements to which he objected, and he has not contested the accuracy of the state court of appeal's description of the evidence.

United States District Court
For the Northern District of California

and location of the ammunition were relevant to whether Washington lived at the house and whether the gun was his. Evidence that the ammunition fit the gun, the ammunition was found in the same room as the gun, and was found with items associated with Washington were circumstantial evidence that he lived there and possessed the gun.

The state appellate court also rejected the claim as to evidence about the other gun. "Evidence regarding the apparently accidental firing of a gun at Cary Court in June 1998, a few months before the October search, was relevant to challenge the plausibility of Lewis' version that she had placed the Derringer under her bed without even checking to determine if it was loaded, even though she was previously angered when a gun was accidentally fired in her home. Also, the taped jail conversation in which appellant discussed with Lewis concocting a defense, showed that he sought to encourage Lewis to tell the police that she had been confused as between the Derringer and a .22 caliber handgun that she had previously possessed before disposing of it. Appellant's efforts to fabricate a defense tend to show a consciousness of guilt, constituting relevant admissible evidence." Cal. Ct. App. Opinion, p. 14. The state court was clearly correct in this application of <u>Strickland</u>. The evidence that Lewis had been angered by the firing of another gun in the house and that her children lived in the house made her testimony that she put the Derringer under the mattress without checking it quite unbelievable. <u>See</u> RT 2221, 2228. It was permissible impeachment material as to which an objection would have been futile. There was neither deficient performance nor prejudice.

The state appellate court rejected the contention that counsel was ineffective for failing to object to a law enforcement officer's testimony that a Derringer is a small weapon commonly preferred by criminals and drug dealers for its ability to be concealed. As the state court explained, this was admissible in light of defense counsel's efforts to "insinuate through questioning that the Derringer was a 'lady's gun' such as might be lawfully possessed by a female to defend herself. In this manner, the defense sought to link the gun to Lewis, Pam Young, and Mildred Thompson. . . . Because [the officer's] testimony on this point was designed to counter this defense tactic, it is improbable that an objection to this prosecution line of questioning

11

would have been sustained." Cal. Ct. App. Opinion, ¶. 14-15.  This rejection of the ineffective assistance claim was a reasonable application of <u>Strickland</u>.  The evidence about the Derringer was probative to undermine the defense suggestion that the gun was not the sort a man would own.  Moreover, defense counsel pursued this area of evidence as he made helpful points on cross-examination that any gun can be lethal, that the officer had confiscated very few Derringers during his career, and that a Derringer is not very accurate at a distance.

c.    <u>Gang Evidence</u>

Washington contends that his counsel was ineffective in not causing to be excluded certain statements by law enforcement officers that he contends implied that Washington was involved with a gang.  Officer Gant described his job assignment by identifying himself as a member of a gang task force who was assigned to track down gang members, and to follow high risk parolees who have been paroled for weapons, sex or drug offenses.   He then explained the meaning of some statements Washington had made.  Washington contends this problem was exacerbated when deputy Stewart and inspector Conner identified their present job assignments as gangs coordinator and gang unit worker.

The California Court of Appeal found no deficient performance and no prejudice.  "Gant was merely recounting his employment, which was relevant to his expertise; there was no contention or evidence that appellant was a gang member or that Cary Court or the Derringer had any gang connections." Cal. Ct. App. Opinion, p. 15.

Washington has not shown this rejection of his claim to be contrary to, or an unreasonable application of, <u>Strickland</u>, especially in light of his concession that "Gant did not identify Washington as a gang member, high risk parolee or heavy narcotics dealer."  Petition For Review, p. 7.  Gant was qualified as an expert in narcotics and dangerous drugs, and testified as to the meaning of some cryptic and slang language in the recorded conversations between Lewis and Washington.  Washington errs insofar as he suggests that Gant gave testimony that suggested these two persons were gang members or involved in gang activities.

United States District Court
For the Northern District of California

1

2                    d.    George Fitzpatrick

3        Washington contends that the some of the evidence about his friend, George Fitzpatrick,

4   unfairly suggested the jury should infer that Washington had conspired with Fitzpatrick in the

5   robbery and therefore counsel should have objected.

6        The state appellate court determined that the article about George Fitzpatrick was relevant

7   to show that the ammunition was Washington's because the article was rolled up in a jumpsuit

8   next to the ammunition found in the closet.  In turn, "evidence as to the ammunition was highly

9   probative as to possession of the Derringer, since the ammunition fit the Derringer and was

10  recovered in the same room."  Cal. Ct. App. Opinion, p. 17.

11       The evidence the jury heard about Fitzpatrick simply was not such as to paint Washington

12  in a bad light and certainly did not suggest to the jury that Washington and Fitzpatrick were co-

13  conspirators in the robbery that led to the chase.  The evidence about the car and their friendship

14  was probative as to Washington's possession of the Derringer.  Their friendship tended to show

15  that the article about Fitzpatrick (that was rolled up in a jumpsuit) was put in the closet by

16  Washington and tended to show Washington lived there.  The court also notes that counsel did

17  object to the evidence about Fitzpatrick's crime as highly prejudicial under California Evidence

18  Code § 352.  RT 1923.    The state appellate court's determination that counsel was not

19  prejudicially ineffective was a reasonable one as an objection to the admissible and relevant

20  evidence would have been futile.   Counsel did not engage in deficient performance and no

21  prejudice resulted from the failure to object to this evidence.

22

23                    e.    Narcotics And The Stolen Computer

24       Washington next complains that counsel was ineffective in not objecting to evidence

25  showing he was involved with illegal drugs and there was a stolen laptop computer in the house.

26       The drug evidence was that Washington "instructed Lewis to offer rock cocaine to Ron

27  Young in return for favorable testimony.  Lewis then testified appellant told her to give cocaine

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

to Ron Young in order to secure his testimony that the gun belonged to Young." Cal. Ct. App. Opinion, p. 15.  The state appellate court determined that the evidence was properly admitted because it was relevant to show Washington's "effort to procure favorable testimony, and as showing consciousness of guilt." Id. at 16.  Further, the trial court had excluded the more damaging part of the evidence, i.e., evidence that suggested that Washington and Lewis were involved in dealing drugs.  With this restriction on the scope of the evidence, and in light of the high probative value of the drugs-for-testimony trade as evidence tending to show consciousness of guilt, there is no chance that this evidence would have been excluded had defense counsel objected to it.  The failure to object to this evidence was not ineffective assistance of counsel, i.e., it was not deficient performance and did not result in prejudice.

The evidence of the stolen laptop computer was that it was Lisa Lewis, not Washington, who had it.  The evidence was relevant to impeach her testimony that she identified Washington as the gun owner to avoid losing her subsidized housing.  Lewis had testified to "alleged concerns over losing her subsidized housing if she owned a gun–and yet she harbored no similar concerns in telling the police that the stolen laptop computer recovered in her home had been obtained from a thief who was now in prison." Cal. Ct. App. Opinion, p. 16.  The appellate court found that it was not an abuse of discretion to admit such relevant evidence. Id. at 17.  The failure to object to this evidence was not deficient performance because an objection would have been futile.  The evidence was probative to undermine Lewis' after-the-fact explanation as to why she initially told police that Washington must have put the gun in the house.  Further, the testimony focused on  Lewis' possession of the stolen property and not Washington's.

Ultimately, although short descriptions of the evidence that was admitted – i.e., other crimes, drugs, gangs, conspiracies, other guns, and stolen property – make the evidence sound quite out of place in a felon-in-possession trial, when one examines these items, it becomes clear that they were not so out of place.  Sometimes the reasoning involves several steps, but there were legitimate reasons for the admission of the evidence as to which Washington now blames counsel for not objecting.  For example, a defendant's involvement with drugs at first blush

United States District Court
For the Northern District of California

would appear to have no place in the felon-in-possession trial, but on closer examination its relevance becomes clear: the cocaine rocks were Washington's currency to try to buy favorable testimony, which in turn showed his consciousness of guilt, which in turn was circumstantial evidence of his guilt.  Further, a lot of the evidence fails to live up to the appellate briefs' descriptions of its inflammatory quality.  For example, what he calls "gang evidence" was nothing to do with Washington's conduct but was instead that some law enforcement witnesses' job descriptions involved gang work.  Counsel's failure to object to the various items of admissible evidence did not amount to deficient performance.  And the failure to object to the evidence had little impact since the evidence of guilt on gun possession crime was strong. There was no realistic possibility that the jury felt it should convict him because it perceived him to be a bad person or thought he must be guilty of some crime even if not the one charged.

As an afterthought to his ineffective assistance of counsel claim, Washington urges that the admission of the evidence to which counsel did not object also violated his right to due process. Petition For Review, ¶. 21-22.  The admission of evidence violates due process if there are no permissible inferences the jury may draw from the evidence.  Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).  As discussed above, there were permissible inferences that could be drawn from the evidence, so its admission did not violate due process.

2.    Inspector Conner's Opinion Testimony

Washington contends that trial counsel was ineffective in that he failed to object to opinion testimony from inspector Conner.

The California Court of Appeal rejected this claim for lack of a showing of deficient performance and lack of a showing of prejudice.  As to the first prong, the court stated that "the record shows trial counsel told the court he had tactical reasons for not objecting." Cal. Ct. App. Opinion, p. 28.  Notwithstanding that defense counsel remained silent when the trial judge put on the record that counsel said he had strategic reasons for not objecting, see RT 2068-69, Washington obtained a declaration from defense counsel to the effect that he had no tactical reason for not objecting.  That declaration does not, however, address the other determination

by the California Court of Appeal, i.e., that there was no prejudice from the failure to object.

> Of more significance is that appellant has not made a showing of prejudice from these claimed errors. Testimony by Conner as to his opinions or conclusions about the tape recorded conversations added nothing new to the case, and his conclusions were obvious ones that were also confirmed by other evidence, including Lewis's testimony and her own statements on the tapes, which were most damning. Although the opinion testimony might have been challenged and excluded, as we have pointed out, the other evidence against appellant was very compelling, and his defense was highly implausible. It is not reasonably probable that a result more favorable to appellant would have been reached if Conner had not been allowed to so testify.

Cal. Ct. App. Opinion, p. 28.

This court need not determine whether there was deficient performance in failing to object to the evidence because, like the California Court of Appeal, this court sees no prejudice resulting from the failure to do so.  Conner's opinions about what the parties meant in their conversation corroborated other evidence.   With or without his opinions, the case against Washington was very strong.  Also, several of his opinions about what the conversations between Lisa Lewis and Washington meant were consistent with the testimony from Lewis.  The state court's rejection of the ineffective assistance of counsel claim was not contrary to, or an unreasonable application of, <u>Strickland</u>.  Finally, insofar as Washington is attempting to assert that the mere use of expert testimony violated his right to due process, the claim fails as there is no clearly established Supreme Court holding that expert testimony concerning an ultimate issue is per se improper.  <u>See</u> <u>Moses v. Payne</u>, 555 F.3d 742, 761 (9th Cir. 2009).

B.      <u>Intent And Possession Issues</u>

Washington contends that his trial attorney was ineffective in failing to request an instruction that more clearly defined intent to possess, that the trial court failed to give such an instruction <u>sua sponte</u>, and that the prosecutor's closing argument exacerbated the problem.  He contends that all these combined to cause a violation of his right to due process.

At the trial, the jury was given a pattern instruction on the elements of the crime of possession of a firearm, including a definition of constructive possession.

> Every person who, having previously been convicted of a felony, owns or has in his possession or under his custody or control any pistol, revolver, or other firearm is guilty

16

of a violation of Penal Code section 12021(a)(1) of a crime. [¶]  In this case, the previous felony has already been established by stipulation so that no further proof of that fact is required.  You must accept as true, the existence of this previous felony conviction.  There are two kinds of possession, actual possession and constructive possession. "Actual possession" requires that a person exercise direct physical control over a thing.  "Constructive possession" does not require actual possession, but does require that a person knowingly exercise control over or the right to control a thing, either directly or through another person or persons.  One person may have possession alone, or two or more persons together may sure (sic) actual or constructive possession.  In order to prove this crime, each of the following elements must be proved: [¶]  One, the defendant having previously been convicted of a felony owned, had in his possession or had under his control a firearm. [¶]  And two, the defendant had knowledge of the presence of the firearm.

RT 2685; see CALJIC 12.44.  The jury also was given a pattern instruction on general criminal intent:

In the crime charged in the information there must exist a union or joint operation of act or conduct and general criminal intent.  General intent does not require an intent to violate the law.  When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful. [¶] When the evidence shows that a person voluntarily did that which the law declares to be a crime, it is no defense that he did not know that the act was unlawful or that he believed it to be lawful.

RT 2684; see CALJIC 3.30.

In his state court appeal, Washington argued that the instructions were inadequate because they permitted the jury to find him guilty without finding that he knowingly exercised the right to control the gun, relying on People v. Jeffers, 41 Cal. App. 4th 917, 922 (Cal. App. Ct. 1996).  The state appellate court found Jeffers distinguishable because that defendant contended that his temporary possession of a gun was unintentional (in that he was unaware there was a handgun in a box inside a bag he delivered to a gun shop) whereas Washington's defense was not that he unintentionally possessed the gun but instead that he did not possess it at all.  Washington's jury had been instructed on the elements of intent, possession, control, and knowledge, as well as the instruction that it was to "'consider the instructions as a whole and each in light of all the others.'" Cal. Ct. App. Opinion, p. 22.  The instructions given and counsel's argument stressed that Washington had to have knowingly exercised control over the firearm to be guilty.  The trial court did not err in failing to give sua sponte an additional instruction on intent to constructively possess the firearm.  Id.

1    The California Court of Appeal also rejected the argument that the prosecutor misled the

2    jury as to the intent necessary for constructive possession of a firearm.  Cal. Ct. App. Opinion,

3    ¶. 22-23.  The comments Washington "quotes from the record do not support his claim of

4    misconduct, when considered in context." Id. at 23.

5    The prosecutor argued that appellant's regular presence at Cary Court and the discovery
     of the ammunition and gun in his bedroom was circumstantial evidence of his intent to
6    possess and control the weapon.  Arguing that even if appellant never touched the
     weapon it was within his control, the prosecutor pointed out that he was not required to
7    show appellant had an intent to use the gun in any particular way, only that he exercised
     dominion or control over it.  The prosecutor also advised the jury, correctly, that
8    "constructive possession does not require actual possession, but does require that a person
     knowingly exercises control or the right to control a thing either directly or through
9    another person or persons."

10   Accessible objects a person knows are in the bedroom he routinely occupies for
     the night may reasonably be deemed to be within that person's custody and control, which
11   amounts to constructive possession.  *When the prosecutor's arguments are considered
     in context, we find that he did not suggest the jury could convict appellant if it simply
12   concluded he knew the Derringer was under the bed, where he had access to it.*  Rather
     the prosecutor went through the elements of the offense and focused on the issues he
13   believed were pivotal under the facts of the case. . . .

14   It does appear that some of the prosecutor's arguments could have been inaccurate,
     if viewed in isolation.  For instance, the prosecutor argued that "[W]e don't have to show
15   that he had intentions to use it or that he handled it or that he touched it.  Constructive
     possession means that you have – it's in a place where you can get it.  I mean, he's living
16   at the house.  He can get to that gun.  That's what the whole law is about.  I mean, if we
     believe the defendant's version, he could be around guns and ammunition.  He could walk
17   in the house[,] there could be drugs, there could be guns, there could be ammunition, as
     long as he doesn't touch them, then he's not in possession.  Wrong.  That is constructive
18   possession.  The very definition.  He lives there.  He has knowledge."  The prosecutor
     also argued that the appellant "admits knowledge and residency to the police.  That's
19   constructive possession.  If that's not constructive possession, it means nothing.  The law
     means nothing."

20
     These statements, if viewed in isolation, omit a discussion of the element of
21   knowing exercise of control.  However, in this same argument, the prosecutor again
     emphasized to the jury that it must also find a knowing exercise of control: "You don't
22   have to have actual possession, but [the law] does require that you knowingly exercise
     control or the right to control . . . ."
23

24   Cal. Ct. App. Opinion, ¶. 23-24 (emphasis added).  Reversal was not necessary because any

25   misstatements did not result in a miscarriage of justice in light of the argument that, as a whole,

26   told the jury it had to find knowing exercise of control and possession.  Id.

27   The appellate court rejected the ineffective assistance of counsel claim, reasoning that it

28   was "not reasonably probable that defendant would have achieved a more favorable result absent

the prosecutor's statements to the jury on this subject" in light of the compelling evidence of guilt and the legally correct instructions. Id. With no prejudice from the prosecutor's argument, trial counsel was not ineffective in failing to object to it. Id. at 24-25.

The California Court of Appeal's rejection of these related claims was not contrary to, or an unreasonable application of, clearly established federal law. Although Washington argues that there was substantial evidence that he "accidentally gained knowledge" that the gun was under the mattress, Petition For Review, p. 27, there was not substantial evidence and, in any event, how he came to know if its existence was not essential to the question of possession. His defense was not of accidental possession but that he did not possess the gun at all.

First, the instructions given were legally sufficient, as they required that the jury find both possession and knowledge of the firearm, as well as that Washington acted with general criminal intent. The Jeffers case does not aid Washington because that court explained that if the jury had been instructed properly regarding general intent, the court would have confidence the jury had considered the legal principle of intent to exercise control over the gun. 41 Cal. App. 4th at 925. In Washington's case, a general intent instruction *was* given, and it was not necessary to supplement it with another instruction. Washington has not shown that an instructional error was committed, let alone that any such error so infected the entire trial that the resulting conviction violated due process. See Estelle v. McGuire, 502 U.S. 62, 72 (1991).

Second, his ineffective assistance of counsel claim fails with regard to the instructions. Washington has not shown deficient performance or resulting prejudice from counsel's failure to request additional instructions regarding intent and possession. The instructions given were legally sufficient. His argument that he could have raised an instructional error claim to the trial court if he had been present at a reading of a previously omitted instruction fails to persuade because there was no instructional error for the reasons just stated.[2]

_____

[2]It is unlikely that Washington intended his argument that his absence from the reading of the unintentionally omitted jury instruction (defining firearm) violated due process to be a separate claim in light of its burial at the end of the discussion of the instructional error/prosecutorial misconduct/ineffective assistance claim. See Petition For Review, p. 28. However, even if he did intend it as a separate claim, the claim would fail because of the

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Third, the state court's determination that the prosecutor did not engage in prosecutorial

2 misconduct, when he made the statements that Washington now argues allowed the jury to

3 convict without finding intent, was not unreasonable.  The appropriate standard of review for

4 a prosecutorial misconduct claim in a federal habeas corpus action is the narrow one of due

5 process and not the broad exercise of supervisory power.  <u>Darden v. Wainwright</u>, 477 U.S. 168,

6 181 (1986); <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis

7 in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the

8 prosecutor.")  Under <u>Darden</u>, the inquiry is whether the prosecutor's remarks were improper and,

9 if so, whether the comments infected the trial with unfairness.  <u>Tan v. Runnels</u>, 413 F.3d 1101,

10 1112 (9th Cir. 2005).  The prosecutor's arguments that suggested the presence of the gun in the

11 house plus defendant's presence in the house amounted to constructive possession or that mere

12 knowledge of the existence of the gun amounted to constructive possession were not legally

13 correct, but elsewhere in his argument the prosecutor did state that the law required that the

14 defendant knowingly exercise control or the right to control.  <u>See</u> RT 2665.    "Because

15 'improvisation frequently results in syntax left imperfect and meaning less than crystal clear,' 'a

16 court should not lightly infer that a prosecutor intends an ambiguous remark to have its most

17 damaging meaning or that a jury, sitting through a lengthy exhortation will draw that meaning

18 from the plethora of less damaging interpretations.'"  <u>Williams v. Borg</u>, 139 F.3d 737, 744 (9th

19 Cir. 1998) (citation omitted).  It appears that the prosecutor was at some points attempting to get

20 the jury to make the inference of dominion and control from the fact that the firearm was

21 discovered in a place over which the defendant had general dominion and control – which was

22

_____

23 complete harmlessness of any error.  <u>See</u> Cal. Ct. App. Opinion, p. 25-26.  As the state appellate

24 court explained, Washington's absence was obviously at his own request because he was absent
     to tend to his hospitalized wife, and the instruction given in his absence was routine and agreed
     to by defense counsel.  Washington was not in custody at the time, and had voluntarily failed to

25 be present for the scheduled trial date.  Although a defendant has a right to be present "at any
     stage of the criminal proceeding that is critical to its outcome if his presence would contribute

26 to the fairness of the procedure," <u>Kentucky v. Stincer</u>, 482 U.S. 730, 745 (1987), the Supreme
     Court has never held that this kind of an error is structural error.  Washington's presence would

27 not have been useful or critical to the proceedings or contributed in any way to its fairness.
     There was no indication that anything other than the reading of the firearm instruction was to

28 be done and his absence made no difference to that reading.

consistent with California law, see Cal. Ct. App. Opinion, ¶. 20-21 – but since he didn't clarify that these were facts to support an inference, his comments did in several places suggested that residency plus knowledge were enough to convict.  See RT 2671.  However, this court will not infer that the jurors thought they could return a guilty verdict without finding that Washington knowingly exercised the right to control the gun – especially in light of the prosecutor's overall argument that mentioned the general intent requirement, RT 2590, the importance of knowledge about the gun, RT 2613-14, 2616, that the evidence showed him in possession of the gun, RT 2616, that knowledge and possession were intertwined, RT 2663, and, most importantly, that the law required he knowingly exercise control or the right to control, RT 2665.  The impact of the prosecutor's statements also was lessened by the defense counsel's closing argument emphasizing that knowledge was not the equivalent of possession, RT 2629, 2631, 2643, 2645, by the jury instructions that were legally correct on the elements of the crime, RT 2684-2685, and by the jury instruction that the jury was to follow the law as the judge stated it rather than as counsel argued it, RT 2674.  The state court's rejection of the prosecutorial misconduct claim was not contrary to, or an unreasonable application of, clearly established federal law.  See Boyde v. California, 494 U.S. 370, 384-85 (1989) ("arguments of counsel generally carry less weight with a jury than do instructions from the court.  The former are not evidence, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law.")

Fourth, Washington has not shown that defense counsel's failure to object to the prosecutor's closing argument amounted to ineffective assistance of counsel.  Washington does not establish the necessary prejudice because he has not shown that there is a reasonable probability that the result of the proceedings would have been different if counsel had objected.  It may have been clearer when heard than when read, but the transcript suggests a rather muddled argument that may well have been made better for the prosecutor if the defense counsel had objected because the prosecutor could have made a more explicit argument about the chain of inferences that should be drawn that would lead the jury to a guilty verdict.  Also, the impact

United States District Court
For the Northern District of California

of the absence of an objection to the argument was minimal because the instructions ultimately given correctly stated the law on the elements of the crime and informed the jurors that they were to follow the court's statements of the law rather than counsel's arguments.  See Richardson v. Marsh, 481 U.S. 200, 206 (1987) (jurors are presumed to follow instructions).  Washington is not entitled to relief on this claim.

C.      Absence of Unanimity Instruction

Washington contends that his due process rights were violated by the trial court's failure to sua sponte instruct the jury that California law requires the jurors to unanimously agree on the particular criminal act they believe defendant committed, if more than one act could constitute the offense.  According to petitioner, because there was more than one gun at the house, such an instruction was required to avoid the possibility that the jury might reach a guilty verdict based on his possession of another firearm discharged at the Cary Court residence several months earlier instead of based on his possession of the Derringer.  He also contends there was ineffective assistance of counsel in failing to request such an instruction.

The California Court of Appeal concluded that, as a matter of state law, a unanimity instruction was not necessary.  See Cal. Ct. App. Opinion, ¶. 18-20.  The general rule in California is that a unanimity instruction is required only where the evidence indicates jurors could disagree as to the particular act the defendant committed.  Id. at 19.  Such disagreement wasn't a concern here.  "It is apparent from the information and the verdict form signed by the jury foreperson that appellant was accused of possessing only the Derringer, 'on or about the 28th day of October, 1999,' which was the date the search warrant was executed at Cary Court" and the date the gun was discovered.  Id.  There was evidence of other guns Washington had possessed on earlier occasions, but his possession of any such gun was not charged in the information and was never argued to the jury as a basis for conviction, and the jury never indicated any confusion on the issue.  Id.  The court further found that the absence of such an instruction could not have been prejudicial, because a reasonable juror who would have voted

1  to convict based on the weak evidence showing Washington was present when a gun was shot

2  months earlier would certainly also have credited the much more compelling evidence showing

3  that Washington possessed the Derringer on the date charged in the information. Id. at 20. For

4  the same reason it found no prejudice in not giving the instruction, the state appellate court

5  rejected the claim that the failure to reject such an instruction constituted ineffective assistance

6  of counsel. Id. at 20 n.6.

7       Washington is not entitled to federal habeas relief on this claim.  The state court

8  determined that a unanimity instruction was not required as a matter of state law, and that

9  determination is binding on this court.  See Waddington v. Sarausad, 129 S. Ct. 823, 832 n.5

10 (2009) ("we have repeatedly held that 'it is not the province of a federal habeas court to

11 reexamine state-court determinations on state-law questions.'")

12      Washington also had no right to the instruction as a matter of federal constitutional law.

13 Criminal defendants in state court have no federal constitutional right to a unanimous jury

14 verdict.  See Schad v. Arizona, 501 U.S. 624, 631-32 (1991) (rule that jurors not required to

15 agree upon single means of commission of crime applies equally to contention they must agree

16 on one of alternative means of satisfying mental state element of crime); Apodaca v. Oregon,

17 406 U.S. 404, 410-12 (1972) (rejecting 6th Amendment right to jury trial challenge to 10-2 state

18 jury verdict); Johnson v. Louisiana, 406 U.S. 356, 359-63 (1972) (rejecting due process

19 challenge to 9-3 state jury verdict).  Since a criminal defendant in a state prosecution is not

20 entitled to a unanimous verdict at all under the federal Constitution, the state appellate court's

21 determination that an instruction on jury unanimity was unnecessary under state law in the

22 circumstances of the case cannot be considered a violation of federal due process.  In light of the

23 determination that neither the federal constitution nor state law required a unanimity instruction,

24 counsel's failure to request such an instruction did not amount to deficient performance and there

25 was no resulting prejudice. For these reasons, the state appellate court's rejection of this claim

26 was not contrary to, or an unreasonable application of, clearly established Supreme Court

27 authority.

28

1    C.      Cumulative Error Claim

2           Washington contends that the cumulative failures of counsel to make the evidentiary

3    objections discussed in this order, plus counsel's failure to request appropriate instructions and

4    object to the prosecutor's closing argument denied him his rights to effective assistance of

5    counsel and due process.  Resp. Exh. L, Petition For Writ of Habeas Corpus, p. 10.

6           In some cases, although no single trial error is sufficiently prejudicial to warrant relief,

7    the cumulative effect of several errors may still prejudice a defendant so much that his

8    conviction must be overturned.  In examining the ineffective assistance claims, this court has

9    considered the cumulative impact of the alleged deficiencies of counsel because "'prejudice may

10   result from the cumulative impact of multiple deficiencies.'"  Harris v. Wood, 64 F.3d 1432,

11   1438 (9th Cir. 1995) (quoting Cooper v. Fitzharris, 586 F.2d 1325, 1333 (9th Cir. 1978) (en

12   banc)).  In other words, in a case with multiple instances of deficient performance, there may be

13   a reasonable probability that, absent the various deficiencies, the outcome of the trial might well

14   have been different.  To consider the overall impact, one considers only the instances where

15   deficient performance has been found and does not consider instances where deficient

16   performance has not been found – in other words, lots of non-mistakes cannot be added together

17   to find prejudice.  Here only two claims were resolved on just the prejudice prong and not also

18   on the deficient performance prong: the claims that counsel was ineffective in (a) failing to

19   object to the closing argument and (b) failing to object to inspector Conner's opinions.  Even

20   when viewed the aggregate, these two instances of deficient performance did not result in

21   prejudice.  That is, there is no reasonable probability that the result of the proceeding would have

22   been different if counsel had objected to the prosecutor's closing argument about constructive

23   possession and objected to inspector Conner's opinions.  This cumulative error claim fails.

24

25   D.      Challenges To The Sentence

26           1.      The Sentence Was Not Cruel And Unusual Punishment

27   Washington contends that his sentence of 28 years to life imprisonment violates his

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Eighth Amendment right to be free from cruel and unusual punishment.  During his appeal, the U. S. Supreme Court upheld California's Three Strikes law against an Eighth Amendment challenge in <u>Ewing v. California</u>, 538 U.S. 11 (2003).  In his appellate reply brief, Washington appeared to concede defeat on the issue, and in his petition for review to the California Supreme Court argued that the sentence violated California's constitutional ban on cruel or unusual punishment even if not the Eighth Amendment.  <u>See</u> Appellant's Reply Brief, ¶. 62-63; Petition For Review, p. 30.  The claim is unexhausted, but may be denied because it is not even colorable.  <u>See</u> 28 U.S.C. § 2254(b); <u>Cassett v. Stewart</u>, 406 F.3d 614, 623-24 (9th Cir. 2005).

A criminal sentence that is significantly disproportionate to the crime for which the defendant was convicted violates the Eighth Amendment's prohibition of cruel and unusual punishment.  <u>See</u> <u>Solem v. Helm</u>, 463 U.S. 277, 303 (1983) (sentence of life imprisonment without possibility of parole for seventh nonviolent felony violates Eighth Amendment).  "[O]utside the context of capital punishment, <u>successful</u> challenges to the proportionality of particular sentences will be exceedingly rare."  <u>Id.</u> at 289-90 (citation and quotation marks omitted).  "'The Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime.'"  <u>Ewing</u>, 538 U.S. at 23 (quoting <u>Harmelin v. Michigan</u>, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)).  Under this proportionality principle, the threshold determination for the court is whether petitioner's sentence is one of the rare cases in which a comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.  <u>Harmelin</u>, 501 U.S. at 1005; <u>Ewing</u>, 539 U.S. at 30-31 (applying <u>Harmelin</u> standard).  Only if such an inference arises does the court proceed to compare petitioner's sentence with sentences in the same and other jurisdictions.  <u>See</u> <u>Harmelin</u>, 501 U.S. at 1005; <u>cf.</u> <u>Ewing</u>, 538 U.S. at 23. The threshold for an "inference of gross disproportionality" is quite high.  <u>See, e.g.</u>, <u>Ewing</u>, 538 U.S. at 30 (sentence of 25 years to life for conviction of grand theft with prior convictions was not grossly disproportionate); <u>Lockyer v. Andrade</u>, 538 U.S. 63 (2003) (upholding two consecutive 25-to-life terms for two convictions of theft of videotapes with prior convictions);

United States District Court

For the Northern District of California

1    <u>Harmelin</u>, 501 U.S. at 1008-09 (mandatory sentence of life without possibility of parole for first

2    offense of possession of 672 grams of cocaine did not raise inference of gross

3    disproportionality).  <u>Andrade</u> and <u>Ewing</u> are the Supreme Court's most recent pronouncements

4    on Eighth Amendment claims regarding prison sentences and both upheld California Three

5    Strikes sentences for shoplifters with prior convictions.  One of the important lessons from these

6    two cases is that relief under the Eighth Amendment continues to be reserved for the extreme

7    cases.

8         In determining whether the sentence is grossly disproportionate under a recidivist

9    sentencing statute, the court looks to whether such an "extreme sentence is justified by the

10   gravity of [an individual's] most recent offense and criminal history."  <u>Ramirez v. Castro</u>, 365

11   F.3d 755, 768 (9th Cir. 2004); <u>see</u> <u>Ewing</u>, 538 U.S. at 28.  In judging the appropriateness of a

12   sentence under a recidivist statute, a court may take into account the government's interest not

13   only in punishing the offense of conviction, but also its interest "'in dealing in a harsher manner

14   with those who [are] repeat[] criminal[s].'"  <u>United States v. Bland</u>, 961 F.2d 123, 129 (9th Cir.

15   1992) (quoting <u>Rummel v. Estelle</u>, 445 U.S. 263, 276 (1980)).  The Eighth Amendment does not

16   preclude a state from making a judgment that protecting the public safety requires incapacitating

17   criminals who have already been convicted of at least one serious or violent crime, as may occur

18   in a sentencing scheme that imposes longer terms on recidivists.  <u>See, e.g.</u>, <u>Ewing</u>, 538 U.S. at

19   25 (upholding 25-to-life sentence for recidivist whose current conviction was for grand theft (for

20   shoplifting three golf clubs)); <u>Rummel</u>, 445 U.S. at 284-85 (upholding life sentence with

21   possibility of parole for recidivist convicted of fraudulent use of credit card for $80, passing

22   forged check for $28.36 and obtaining $120.75 under false pretenses); <u>Nunes v. Ramirez-Palmer</u>,

23   485 F.3d 432, 439 (9th Cir. 2007) (upholding 25-to-life sentence for current conviction of petty

24   theft with a prior theft-related conviction after finding that the petitioner's criminal history was

25   longer, more prolific, and more violent than that in <u>Andrade</u> where a stiffer sentence was

26   upheld); <u>Taylor v. Lewis</u>, 460 F.3d 1093, 1101-02 (9th Cir. 2006) (upholding 25-to-life sentence

27   upon a conviction of possession of 0.036 grams of cocaine base with two prior felony

28

United States District Court
For the Northern District of California

convictions for voluntary manslaughter and robbery, and past violations of probation and parole); <u>Rios v. Garcia</u>, 390 F.3d 1082, 1082-83 (9th Cir. 2004) (upholding 25-to-life sentence for current conviction of petty theft with a prior theft-related conviction and second degree burglary (for episode in which he shoplifted two watches having a combined value of $79.88, was chased by a loss prevention officer and was apprehended in the store parking lot after a minor struggle) and prior convictions were two robbery convictions in 1987); <u>Bland</u>, 961 F.2d at 128-29 (upholding life sentence without the possibility of parole for being a felon in possession of a firearm with thirteen prior violent felony convictions, including rape and assault); <u>but see, e.g.</u>, <u>Ramirez</u>, 365 F.3d 755 (25-to-life sentence was grossly disproportionate for offender whose current crime was petty theft with a prior theft-related conviction and the two prior strike convictions were robbery convictions); <u>Reyes v. Brown</u>, 399 F.3d 964 (9th Cir. 2005) (remanding for further proceedings to determine whether 26-to-life sentence was grossly disproportionate for current offense of perjury (for making misrepresentations on a DMV driver's license application when he impersonated a friend) and prior convictions were a 1981 residential burglary conviction committed as a juvenile and a 1987 armed robbery conviction).

The standard of review in § 2254(d) presents an additional problem for habeas petitioners asserting Eighth Amendment sentencing claims.4  In <u>Andrade</u>, 538 U.S. at 72-73, the Court rejected the notion that its case law was clear or consistent enough to be clearly established federal law within the meaning of 28 U.S.C. § 2254(d), except that it was clearly established that a gross disproportionality principle did apply to sentences for terms of years (as well as to the death penalty).  However, the precise contours of that principle "are unclear, applicable only in the 'exceedingly rare' and 'extreme' case."  <u>Id.</u> at 73 (quoting <u>Harmelin</u>, 501 U.S. at 1001).

It appears that the California Court of Appeal rejected the federal as well as the state constitutional claims.  <u>See</u> Cal. Ct. App. Opinion, p. 34.  The court noted that Washington had "retreat[ed]" from his position that the sentence violated the federal constitution and the court was bound to follow the Supreme Court's ruling in <u>Ewing</u>.  <u>Id.</u>  The California Court of Appeal's rejection of Washington's claim was clearly consistent with controlling Supreme Court precedent

United States District Court
For the Northern District of California

regarding the Eighth Amendment.  Washington had a lengthy criminal record that included six prior felony convictions: first degree burglary in 1977, second degree burglary in 1981, first degree burglary in 1983, harboring and concealing a felon in 1985, receiving stolen property in 1988, and robbery in 1991.  See Request For Evidentiary Hearing . . . Third Motion (docket # 61), ¶. 5-6.   Attempts at rehabilitation, including earlier terms in jail and prison, had been unsuccessful in dissuading him from a life of crime.  See 7/20/01 RT 30-31 (trial judge declining to strike the prior convictions because Washington's record showed him to be "exactly the type of person" the Three Strikes law was intended to address).   His present offense showed him to present a danger to the community.  See People v. Cooper, 43 Cal. App. 4th 815, 820-25 (Cal. App. Ct. 1996) (California Legislature reasonably presumes possession of a firearm by a felon to be a serious offense; intent of § 12021(a) is "to limit the use of instruments commonly associated with criminal activity and to minimize the danger to public safety arising from the free access to firearms that can be used for crimes of violence . . . The law properly presumes the danger is greater when the person possessing the firearm has previously been convicted of a felony"); see also Bland, 961 F.2d at 128-29 (upholding life without parole for felon in possession with violent criminal history).  Washington's current offense of being a felon in possession of a firearm is more serious than the shoplifting crimes at issue in Andrade and Ewing, in which the Supreme Court upheld Three Strikes sentences for recidivist shoplifters. Washington's sentence of 28-to-life for a recidivist with current conviction of being a felon in possession of a firearm is not that "rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." Ewing, 538 U.S. at 30.  Washington is not entitled to habeas relief on his Eighth Amendment claim

## 2.    There Was No Jury Trial Error In The Sentencing Issues

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to a trial by jury.  U.S. Const. amend. VI.  This right to a jury trial has been made applicable to state criminal proceedings via the Fourteenth Amendment's Due Process Clause.

United States District Court
For the Northern District of California

1

Duncan v. Louisiana, 391 U.S. 145, 149-50 (1968).  The Supreme Court's Sixth Amendment

2

jurisprudence was significantly expanded by Apprendi v. New Jersey, 530 U.S. 466 (2000), and

3

its progeny, which extended a defendant's right to trial by jury to the fact finding used to make

4

enhanced sentencing determinations as well as the actual elements of the crime.  "Other than the

5

fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed

6

statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Id. at

7

488-90 (2000).  The "statutory maximum" for Apprendi purposes is the maximum sentence a

8

judge could impose based solely on the facts reflected in the jury verdict or admitted by the

9

defendant; that is, the relevant "statutory maximum" is not the sentence the judge could impose

10

after finding additional facts, but rather is the maximum he or she could impose without any

11

additional findings.  Blakely v. Washington, 542 U.S. 296, 303-04  (2004).

12

Washington asserts several claims related to the findings in support of his sentence.  First,

13

he appears to contend that the jury did not find him to be a felon for purposes of the felon in

14

possession of a firearm verdict.  This is incorrect as the verdict plainly states that "on or about

15

the 28th day of October, 1998 . . . said defendant having been convicted of a felony, did then and

16

there have in his possession and under his custody and control a firearm."  RT 2706; CT 244.

17

Also, the parties had stipulated that Washington had been convicted of a felony and the jury was

18

instructed with that stipulation.  RT 2685.  This claim fails.

19

Next, Washington contends that it was not proven beyond a reasonable doubt to a jury

20

that the burglary priors were serious felonies.  The claim fails on the law because the Three

21

Strikes sentence was based on his prior convictions, and prior convictions represent a narrow

22

exception to the constitutional right to a jury determination of sentencing factors.  See

23

Almendarez-Torres v. United States, 523 U.S. 224, 244 (1998); Apprendi, 530 U.S. at 490 ("In

24

sum, our reexamination of our cases in this area, and of the history upon which they rely

25

confirms" that the right to a jury applies to all sentencing factors, "[o]ther than the fact of a prior

26

conviction").  The court is unpersuaded by Washington's argument that Almendarez-Torres

27

should be read so narrowly as to cover only whether a conviction occurred and not to cover the

28

United States District Court
For the Northern District of California

legal description of the crime (e.g., robbery or burglary) which will be written on the same abstract of judgment that shows the existence of a conviction. Cf. Shepard v. United States, 544 U.S. 13, 26 (2005) (for federal career criminal sentencing, court may look at "the charging document, the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information."). The claim also fails on the facts because the jury did make the necessary findings. The jury found with respect to each of the two burglaries that Washington was convicted of "burglary of an inhabited dwelling," RT 2898, 2899, which by definition is a serious felony. A burglary of an inhabited dwelling is a first degree burglary under California Penal Code § 460(a), and a first degree burglary is listed as a serious felony for purposes of Three Strikes sentencing. See Cal. Penal Code § 1192.7(c)(18). Even if Washington did have a right to a jury trial on prior convictions, he did not have a right to have the jury find that the prior convictions were for serious crimes because they were conclusions of law rather than findings of fact. As to the burglary convictions, the jury made the factual findings that there were two prior convictions and that the convictions were for burglaries of an inhabited dwelling house; it was not the jury's duty to make the additional legal determinations that burglaries of inhabited dwelling houses were first degree burglaries and that first degree burglaries qualified as serious felonies.

Washington also contends that counsel was ineffective in failing to urge that the burglaries were not serious felonies. This claim fails. Although defense counsel conceded that the burglaries were serious felonies, 7/20/01 RT 20, Washington has not explained how defense counsel could have urged otherwise in light of the documentary evidence that showed that the two burglary convictions were for first degree burglaries. RT 2791-2796. Washington has shown neither deficient performance nor resulting prejudice. A lawyer need not file a motion or make an objection that he knows to be meritless on the facts and the law. See Wilson v.

Henry, 185 F.3d at 990; Rupe v. Wood, 93 F.3d at 1445 (failure to take futile action is not deficient performance). Washington is not entitled to the writ on his challenges to the sentence he received.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED. The clerk shall close the file.

IT IS SO ORDERED.

DATED: September 23, 2009

_____
SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California